## MARGARET WALSH v. ROBERT WALSH.

*Husband and wife—Divorce—Extreme cruelty—See opinion for acts and words amounting to.*

On a review of the testimony in this case, *held*, that a decree for an *absolute* divorce should be granted complainant.

Appeal from St. Clair. (Stevens, J.) Argued April 15, 1886. Decided June 17, 1886.

Bill for divorce. Defendant appeals. Decree for *absolute* divorce granted. The facts are stated in the opinion.

---

[1] See *Keyser v. Sutherland,* 59 Mich. 465.

*Frank Whipple* (*A. E. Chadwick*, of counsel), for complainant.

*O'Brien J. Atkinson*, for defendant.

MORSE, J.   The complainant was granted a decree in the circuit court for the county of St. Clair, in chancery, separating her from her husband, the defendant, by reason of his extreme cruelty.   It was found also that, although being of sufficient means and ability to support and maintain her, he had nevertheless wantonly and cruelly refused to do so.

She was also granted a separate cost and maintenance during the term of her natural life, provided she lived chaste and virtuous, and the sum of $1,200 per annum was the amount fixed that the defendant should pay to her for that purpose, to be paid monthly in advance.

She was also allowed such sum or sums of money, to be paid by the defendant, to satisfy such reasonable debts as she had necessarily incurred, prior to filing her bill of complaint, for medical attendance, medicines, support, and maintenance, traveling expenses, and other necessaries, in New York, where she had been residing for medical treatment and change of air, because of the defendant's refusal to furnish her with means to liquidate the same, or to provide the same for her; the amount of such indebtedness to be determined and ascertained by reference to a commissioner.

The decree further provided that she should recover from the defendant the sum of $55 per month, in addition to the temporary alimony already received, from the filing of her bill until the date of the final decree.   The decree also gave her $500 for personal expenses, and counsel fees in the suit, and the costs and expenses of such suit, to be taxed.   From this decree both parties appeal to this Court.

The defendant insists that he has not been guilty of extreme cruelty, or refusal to support complainant; and complainant is not satisfied with the allowance decreed her. Her counsel now ask an absolute divorce, and a division of property.

We do not consider it necessary to go into much detail in disposing of the case here. The record is voluminous, consisting of about 700 pages of printed matter, and the evidence taken and returned is protracted and verbose.

The case lies within a small compass, however, and can be briefly stated.

The charges of extreme cruelty relied upon are :

1. Acts of personal violence.

2. Brutality and personal violence in compelling complainant, while sick, to submit to sexual intercourse, although she was forbidden by her physicians to so submit, and defendant was fully advised thereof.

3. In forbidding her,. under threats, to correspond with, or have personal intercourse with, their son and only child, attending college near New York, while she was stopping in that city, and in threatening to accuse her to this son of gross improprieties.

4. In threatening her with proceedings for divorce, and filing, finally, a bill against her for desertion, while she was sick, in New York, under medical treatment.

5. In threatening to have her arrested for obtaining goods under false pretenses, and writing to tradesmen that she was not his wife, and that she had run away with another man.

6. In writing, during a period of over three years, letters to her, some signed and some unsigned, of an obscene, scurrilous, vulgar, and brutal character, while she was sick, and under medical treatment, in New York, and accusing her in such letters of being full of lust, of unchastity, and of adultery with one of her first-blood cousins, and charging her with perjury, lying, and fraud.

These parties were married in 1862, and, from the evidence, seemed to have lived quite pleasantly and agreeably together until about 1877, a period of fifteen years. The charge of personal violence does not appear to me to be well supported, at least during these years. It is true the complainant testifies to numerous acts of violence committed by defendant in moments of anger ; and her sister swears that at one time, about a year or so after their marriage, she saw defendant strike complainant, coming upon them suddenly ; but she does not know what was the occasion of the blow, or whether it was it anger, or in sport or scuffle, as defendant

claims.  And the story of the wife must be considered to be
colored and exaggerated, in the light of the other evidence.

The uniform testimony of every one connected with the
household—her relatives and his, the domestics employed
about the house, the clerks in the store, and the men and
boys at work about the house and grounds, and boarding
with the family—is to the effect that they were a happy
couple, and apparently very fond of each other, up to about
the year 1877.

They commenced life in a humble way, but as the defend-
ant increased his means the appointments of his home were
enlarged and embellished.  In 1877 they were living in a
fine house, well furnished, and provided with all the conven-
iences, and most of the luxuries, that their neighbors in
Port Huron, of like means and standing in that community,
were provided with.  The complainant was obliged to do
no work unless she wished, and was furnished with elegant
clothing, a horse and carriage, and had free access to the
money drawer, at all times, in her husband's store, and drew
from the same without any stint, save her own economy.

At the time of the filing of the bill they had one child,
Willis J. Walsh, then 19 years of age, who has died during
this litigation between his parents.

It is claimed by the wife that, ever since the birth of
Willis, she has been troubled to a great extent with a disease
peculiar to her sex, which has incapacitated her more or less
for labor; that this disease grew worse as the years went on,
until at last she was forced to submit to a surgical operation
to relieve her ; that her ailment was of such a character that
she was advised by her physicians that, in order to regain
her health, she must abstain from sexual intercourse with
her husband ; that such intercourse was painful and hurtful,
and prevented her recovery, of which her husband was fully
advised ; that she also had an inherited tendency to consump-
tion, the seeds of which disease began to show growth about
1877 ; this, complicated with her other trouble, compelled
her, through and under the advice of physicians, to leave

Port Huron in the fall and winter months, and take up a residence in New York, for change of air and climate.

There is not much evidence in the record tending to show .any very serious lung trouble, either existing or threatened but it appears pretty conclusively that she was afflicted, more ·or less, with the first-named ailment, but not to the extent that she claims.

It is evident, in my opinion, as testified to by Dr. Jenks .an eminent physician of Chicago and Detroit, who treated her at one time, that she became "quite monomaniacal upon the subject of her health and change of climate." She be-·came unhappy, restless, and depressed in spirits, and added to her ailment of body and mind by a want of exercise and -fresh air.

In this condition she became determined to go to New York, and in July, 1876, with the consent of defendant, who paid her expenses and physicians' bills, she went there, staying eight or nine weeks, where she consulted and advised with Dr. Willard Parker. She had cousins living there by ·the name of Birmingham, with whom she stopped during this visit.

In the spring of 1877 she again went to New York, going in April, and returning to Port Huron about the first of September. During this visit a surgical operation was performed. The defendant did not know of the operation until ·after it was over, and was angry about it, not believing it ·necessary or beneficial.

About this time the trouble began between the husband and wife, and the difficulty between them, from thence until ·the filing of complainant's bill, has grown and widened, until the distance between them has led to open rupture, separation, and litigation.

The defendant refused to act upon the advice of the physicians, and insisted upon sexual intercourse with complainant, .and, no doubt, at times used violent means to accomplish it. In 1879 the complainant, after violence and insult, as she claims, left his room and bed, and ever thereafter refused to ·cohabit with him.

The complainant again returned to New York in the winter of 1877 and 1878, and stayed some time. She also was in New York from December, 1878, to September, 1879. Her sister was with her a portion of this time, and died there, in the winter of 1879 and 1880; Mrs. Walsh being in New York also from December, 1879, to sometime in 1880. Her mother was also with her, and died in New York in December, 1880, and was brought back to Port Huron for burial. Complainant has not lived in the same house with defendant since the funeral of her mother.

At first the defendant supported the complainant in New York without much opposition, save grumbling occasionally at the expense; but in 1878 or 1879 he began to refuse her money, and to write her abusive and scurrilous letters. Those, since January, 1879, were preserved by the complainant, and have been presented in the record. They ran through a period of two or three years, and are brutal, obscene, and profane in the extreme. They are such as no man, of any rank in life, could write to his wife, in his right senses, unless he was brutal and beastly in his nature.

They show a disposition entirely and totally different from that manifested by him in the years of his married life before 1878. They may be accounted for, perhaps, upon the theory that his overweening desire for cohabitation with his wife, and a furious jealousy of her cousin, Birmingham, rendered him also a monomaniac upon these subjects.

They are, indeed, more like the crazy ebullitions of an insane man than they are the production of any reasonable, decent human mind. The details of these letters are too filthy and inhuman to be further referred to. It is sufficient to say that the third, fourth, fifth, and sixth allegations of cruelty, as heretofore set forth, are amply sustained and proven out of the defendant's own mouth by these letters; and a decent regard for the ordinary proprieties of domestic life will prevent any court from compelling or allowing a woman to be bound in the duties of wedlock to such a man as the defendant has grown and shown himself to be.

It may be, and there is much evidence tending to show,

that the conduct of the wife in these later years has not been as kind and considerate towards her husband as it ought to have been. She has no doubt magnified her ailments, and absented herself from home when it was not necessary ; but the very disease with which she has been afflicted has, no doubt, been the primary cause of such conduct, her mind being affected by the physical trouble.

There appears naught against her chastity or propriety of conduct worth the consideration of the Court, and the defendant admits that up to her visit to New York she was the best of wives and mothers. We are disposed, therefore, to modify or alter the decree of the court below by granting her an absolute divorce from the defendant.

" The difficulties between the parties have reached a point that renders it undesirable that they should longer attempt to live together. A further continuance of the bond of matrimony would not benefit either." *Briggs v. Briggs,* 20 Mich. 43.

The complainant could not decently live with the defendant, under the circumstances, and she is entitled to an absolute sundering of the tie that binds them, and to a reasonable share of defendant's estate.

The evidence shows that he is quite wealthy, his property being assessed at about $95,000 for taxation, in the city of Port Huron, in the spring of 1885. He admits he is worth about $75,000.

A decree will be entered here for an absolute divorce, and further providing that defendant pay to complainant, as her permanent alimony, the sum of $25,000; to be paid, $5,000 on or before the first day of January, 1887, and $5,000 on or before the first day of January in each year thereafter, until the whole sum shall be paid ; interest to be paid on all sums remaining unpaid annually from the date of such decree.

The said complainant, as a condition precedent to the payment of this allowance, shall release to said defendant, by proper conveyance, her right of dower in and to the real estate of defendant.

When this is done, the said defendant shall secure the pay-

ment of said allowance to complainant, and the decree may be so drawn as to become and be a lien upon the real estate of defendant for the fulfillment of such decree until the said allowance is paid or secured.

The defendant shall also pay the further sum of $3,000 to pay the debts and expenses incurred by complainant before the filing of her bill, because of her husband's neglect or refusal to pay the same ; and the sum of $1,500 to pay her counsel fees. The last-named sums to be paid, respectively, in thirty and sixty days from the date of the decree, together with the costs of both courts, to be taxed. The temporary alimony of $100 per month, as fixed by the court below, to be continued to be paid to her until the first $5,000 of the permanent allowance is paid.

The other Justices concurred.